**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 <br><br> Master Docket Case No. 1:14-cv-01748 <br><br> Honorable Matthew F. Kennelly |
| MARK STATON, <br><br>     Plaintiff, <br><br> vs. <br><br> ABBOTT LABORATORIES, INC.; ABBVIE, INC., <br><br>     and <br><br> Does 1-25, inclusive. <br><br>     Defendants. | **COMPLAINT AND JURY DEMAND** <br><br>   Civil Action No.: _1:15-cv-00619_____ |

COMES NOW Plaintiff, Mark Staton ("Plaintiff"), residing in Gibson County, Tennessee by and through his undersigned counsel, hereby sues Defendants AbbVie, Inc. and Abbott Laboratories, Inc. ("Defendants") and alleges as follows:

## **INTRODUCTION**

1.  This case involves the prescription drug AndroGel® ("AndroGel"), which is manufactured, sold, distributed and promoted by Defendants as a Testosterone Replacement Therapy ("TRT" or hereinafter, "Testosterone").

2.  Defendants misrepresented that AndroGel is a safe and effective treatment for

hypogonadism or "low testosterone," when in fact the drug causes serious medical problems, including life-threatening cardiac events, strokes, and thrombolytic events.

3.    Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for Testosterone. Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "Low T."

4.    As a result, diagnoses of "Low T" have increased exponentially. This has directly related to AndroGel's sales increasing to over $1.3 billion per year.

5.    Consumers of Testosterone were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thrombolytic events.

6.    AndroGel causes hematocrit levels to increase, resulting in a dangerous thickening of the blood of a person using the Testosterone Replacement Therapy. This effect, if not monitored and controlled properly, can lead to life-threatening cardiac events, strokes and thrombolytic events.

7.    Defendants failed to adequately warn physicians and consumers about the risks associated with AndroGel and the monitoring required to ensure the safety of patients using AndroGel.

## **PARTIES**

8.    Plaintiff is a natural person and a citizen of Gibson County, in the State of Tennessee.

9. Defendant Abbott Laboratories, Inc. is a corporation organized and existing under the laws of Illinois and maintains its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064.

10. Defendant AbbVie Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at l North Waukegan Road, North Chicago, Illinois 60064.

11. By way of background, Unimed Pharmaceuticals, Inc. originally developed AndroGel and sought FDA approval in 1999. Before the drug was approved by the FDA in 2000, Solvay Pharmaceuticals, Inc. acquired Unimed Pharmaceuticals, Inc. and subsequently brought AndroGel to market. In 2010, Defendant Abbott Laboratories, Inc. acquired Solvay's pharmaceutical division, which included AndroGel. In 2013, Abbott created AbbVie, a company composed of Abbott's former proprietary pharmaceutical business, which included AndroGel.

12. The true names and capacities of those Defendants designated as Does 1-25 are unknown to Plaintiff. Plaintiff alleges on information and belief that Does 1-25 were involved in the research, development, sales and/or marketing of testosterone pharmaceutical products taken by Plaintiff. Each of these fictitiously named defendants bears legal responsibility for the events and damages set forth in this Complaint.

13. Plaintiff will amend this Complaint to show the identity of each fictitiously named defendant when it has been ascertained.

**JURISDICTION AND VENUE**

3

14.     Pursuant to 28 U.S.C. § 1441(b)(l), the citizenship of defendants sued under fictitious names shall be disregarded.

15.     There is complete diversity among the parties because Plaintiff is a citizen of Tennessee, and none of the Defendants are citizens of that state.

16.     At all times herein mentioned, Defendants engaged in interstate commerce in this judicial district in that they advertised, promoted, supplied, and sold to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public certain pharmaceutical products, including AndroGel.

17.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy between Plaintiff and Defendants (although unspecified) exceeds $75,000, exclusive of interest and cost, and because, among other reasons, Defendants have significant contacts with this district by virtue of doing business within this judicial district.

18.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 because Defendants reside in this district and because a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## **<u>GENERAL ALLEGATIONS</u>**

19.     This action is for damages brought on behalf of Plaintiff who was prescribed and supplied with, received and who has taken and applied the prescription drugs AndroGel as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded,

4

manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants. This action seeks, among other relief, general and special damages and equitable relief in order to enable Plaintiff to treat and monitor the dangerous, severe and life-threatening side effects caused by these drugs.

20.     Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injuries and damages as more fully alleged herein.

21.     At all times herein mentioned, the Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drugs AndroGel for the use and application by Plaintiff.

22.     At all times herein mentioned, Defendants were authorized to do business within the state of residence of Plaintiff.

23.     At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff.

24.     Plaintiff files this lawsuit within the applicable limitations period of first

suspecting that said drugs caused the appreciable harm sustained by Plaintiff. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful cause of Plaintiff's injuries at an earlier time because the injuries were caused without perceptible trauma or harm, and when Plaintiff's injuries were discovered their cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action. Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public and to the medical profession that their Testosterone drugs are safe and free from serious side effects, and Defendants have fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

25. Defendants are estopped from asserting a statute of limitations defense because all Defendants fraudulently concealed from Plaintiff the nature of Plaintiff's injury and the connection between the injury and all Defendants' tortious conduct.

26. Hypogonadism is a specific condition of the sex glands, which often involves the diminished production or nonproduction of testosterone.

27. In 1999, when Unimed Pharmaceuticals Inc., one of the Defendants' predecessor companies, asked for FDA approval of AndroGel, it asserted that hypogonadism was estimated to affect approximately "one million American men."

28. In 2000, when the FDA approved AndroGel, the company announced that the market was "four to five million American men." By 2003, the number increased "up to 20

6

million men." However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get Testosterone prescriptions have no evidence of hypogonadism.  For example, one third of men prescribed Testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a Testosterone prescription.

29.     Defendants coordinated massive advertising campaigns designed to convince men that they suffered from low testosterone.  Defendants orchestrated national disease awareness media blitzes that purported to educate male consumers about the signs of low testosterone.  The marketing campaigns consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to potential testosterone users, and on-line media.

30.     The television advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss Testosterone Replacement Therapy with their doctors if they experienced any of the "symptoms" of low testosterone.  These "symptoms" include listlessness, increased body fat, and moodiness -- all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

31.     Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

32.     While running disease awareness campaigns, Defendants promote their Testosterone products as easy to use topical Testosterone Replacement Therapies. Defendants contrast their products' at-home topical application with less convenient prescription Testosterone injections, which require frequent doctor visits.

33.     Defendants convinced millions of men to discuss Testosterone Replacement Therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease. Although prescription Testosterone Replacement Therapy had been available for years, millions of men who had never been prescribed Testosterone flocked to their doctors and pharmacies.

34.     Consumers of testosterone gel products did not receive safe drugs, but products which cause life-threatening problems, including strokes, heart attacks and serious blood clotting.

35.     Defendants successfully created a robust and previously nonexistent market for their drugs. Defendants spent millions of dollars promoting Testosterone and millions more on unbranded marketing including commercials and the websites www.isitLowT.com and www.DriveForFive.com, which recommend that men have regular checkups with their physicians and five regular tests done, including: cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

36.     Defendants' advertising paid off in a return of approximately $1.3 billion in AndroGel sales. AndroGel is the biggest selling androgen drug in the United States. Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5

billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, Are Testosterone Drugs the Next Viagra?, May 10, 2012, Bloomberg Businessweek, available at: http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

37.     In early 2013, Medical Marketing & Media named two AbbVie executives as "the all-star large pharma marketing team of the year" for promotions of AndroGel and unbranded efforts to advance low T. *See* Singer, Selling That New-Man Feeling, *supra*; *see also*, Larry Dobrow, All-star large pharma marketing team of the year: Androgel, Jan. 2, 2013, Medical Marketing & Media, available at: http://www.mmm-online.com/all-star-large-pharma-marketing-team-of-the-year-androgel/article/273242/.

38.     The marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that the use of Testosterone is safe for human use, even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

39.     On the contrary, there have been a number of studies suggesting that Testosterone Replacement Therapy increases the risk of heart attacks and strokes.

40.     In 2010 the designers of the "Testosterone in Older Men with Mobility Limitations" study reported in the New England Journal of Medicine that they discontinued the study after an exceedingly high number of men in the Testosterone group suffered adverse events.

41.     In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low

Testosterone Levels" which indicated that Testosterone raised the risk of death, heart attack and stroke by about 30%.

42.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that Testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a previous diagnosis of heart disease.

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

43.     The FDA approved AndroGel 1% on February 28, 2000 (AndroGel 1.62% was approved in April, 2011).   After FDA approval, Testosterone was widely advertised and marketed by Defendants as safe and effective Testosterone Replacement Therapies.

44.     AndroGel is a Testosterone hydroalcoholic gel, which is applied to the shoulders and upper arms.  Testosterone enters the body through transdermal absorption.

45.     Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

46.     The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

47.     In men, testosterone levels normally begin a gradual decline after the age of thirty.

48.     The average testosterone levels for most men range from 300 to l,000 nanograms per deciliter of blood.  However, testosterone levels can fluctuate greatly depending on many factors including sleep, time of day, and medication.  Consequently, many men who fall into

10

the hypogonadal range one day will have normal testosterone levels the next.

49.     AndroGel and other gel testosterone therapies may produce undesirable side effects to patients who use the drugs, including but not limited to, blood clotting, myocardial infarction, stroke, and death.

50.     In some patient populations, AndroGel use may increase the incidence of myocardial infarctions and death by over 500%.

51.     In addition to the above, AndroGel is linked to several severe and life-changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied Testosterone.  Patients taking Testosterone may experience enlarged prostates and increased serum prostate-specific antigen levels.

52.     Secondary exposure to Testosterone can cause side effects in others.  In 2009 the FDA issued a black box warning for Testosterone prescriptions, advising patients of reported virilization in children who were secondarily exposed to Testosterone gel.  Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into secondary contact with Testosterone.

53.     Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

54.     Defendants successfully marketed Testosterone by undertaking a "disease awareness" marketing campaigns.  These campaigns sought to create a consumer perception

11

that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low T."

55.     Defendants' advertising programs sought to create the image and belief by consumers and their physicians that the use of Testosterone was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

56.     Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Testosterone. Defendants deceived potential Testosterone users by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

57.     Defendants concealed materially relevant information from potential Testosterone users and minimized user and prescriber concern regarding the safety of Testosterone.

58.     In particular, in the warnings Defendants give in their commercials, online and print advertisements, Defendants fail to mention any potential cardiac or stroke side effects and falsely represent that Defendants adequately tested Testosterone for all likely side effects.

59.     As a result of Defendants' advertising, marketing, and representations about their products, men in the United States pervasively seek out prescriptions for Testosterone. If

Plaintiff in this action had known the risks and dangers associated with Testosterone, Plaintiff would not have taken Testosterone and consequently would not have been subject to its serious side effects.

60.     If Plaintiff's health care provider(s) in this action had known the risks and dangers associated with Testosterone, Plaintiff's health care provider(s) would not have prescribed Testosterone and consequently Plaintiff would not have been subject to its serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

61.     Plaintiff was prescribed AndroGel after taking testosterone injections, which he began in June of 2012 and used AndroGel 1.62% consistently through the beginning of 2013 when he suffered from a stroke.  He continued to use AndroGel even after the stroke, being unaware that it caused the stroke to occur.

62.     Plaintiff was prescribed and used testosterone for symptoms he attributed to low testosterone after viewing Defendants' advertisements.

63.     In keeping with his proactive lifestyle, Plaintiff agreed to initiate Testosterone treatment.  He relied on claims made by Defendants that Testosterone had been clinically shown to safely and effectively raise testosterone level.

64.     Plaintiff suffered from a stroke in the beginning of 2013 in his left optic nerve that caused him to go blind in his left eye, and he lost 20% of his vision in his right eye.  For the rest of his life he must undergo regular testing, adhere to a restrictive diet, and take medication. Due to his stroke he now has a markedly increased risk of additional cardiovascular disease,

cerebrovascular events, deep vein thrombi, pulmonary emboli and death.

65.     Had Defendants properly disclosed the risks associated with Testosterone, Plaintiff would have avoided the risk of these adverse events by either not using Testosterone at all, severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health.

66.     As a direct, proximate, and legal result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug Testosterone as advertised, marketed sold and distributed by Defendants, Plaintiff suffered severe and permanent physical and emotional injuries, including, but not limited to his stroke and subsequent blindness.  Plaintiff has endured pain and suffering, has suffered economic loss, including incurring significant expenses for medical care and treatment, time lost from work, and will continue to incur such expenses in the future.  Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

## FIRST CAUSE OF ACTION

### STRICT LIABILITY- FAILURE TO WARN

67.     Plaintiff incorporates by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

68.     The Testosterone manufactured and/or supplied by Defendants was defective due to inadequate warnings or instructions because Defendants knew or should have known that the products created significant risks of serious bodily harm to consumers, and they

failed to adequately warn consumers and/or their health care providers of such risks. The Testosterone manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of Testosterone, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the products, knowing the products could cause serious injury.

69.     As a direct and proximate result of Plaintiff's reasonably anticipated use of Testosterone as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SECOND CAUSE OF ACTION

### STRICT LIABILITY- DEFECTIVE DESIGN

70.     Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

71.     Androgel was in a defective condition and unreasonably dangerous due to inadequate testing, warnings and instructions for use, which created significant health risks and threat of serious bodily harm to consumers at large, including Plaintiff.

72.     Defendants are strictly liable for Androgel which was in a defective condition and unreasonably dangerous because of the inadequate and incomplete testing, warnings and instructions for use to Plaintiff and Plaintiff's physicians.

15

73.     The risk-utility of Androgel as a treatment for a contrived and pharmaceutical industry-created and -driven condition known as "Low T" was such that this product presented substantial and unreasonable risk with unproven safety or utility.

74.     Consumers including Plaintiff and Plaintiff's physicians had the expectation that Androgel, as designed, tested, and placed within the stream of interstate commerce, was safe and effective for the uses outlined by the Defendants, detailed to physicians, and advertised to the public at large by way of direct-to-consumer advertising.

75.     Plaintiff used Androgel, which the Defendants manufactured, designed, sold, supplied, marketed or otherwise introduced into the stream of commerce, and Androgel caused serious physical injuries to Plaintiff. Defendants' defective design and testing of Androgel is the legal cause of Plaintiff's serious physical injuries, harm, damages and economic loss. Plaintiff will continue to suffer such harm, damages and economic loss in the future.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

76.     Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

77.     At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of Testosterone.

78.     At all times herein mentioned, Defendants negligently and carelessly

16

manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold Testosterone and failed to adequately test and warn of the risks and dangers of Testosterone.

79.     Despite the fact that Defendants knew or should have known that Testosterone caused unreasonable, dangerous side effects, Defendants continued to market Testosterone to consumers including Plaintiff, when there were safer alternative methods of treating loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions Testosterone's advertising claims are caused by low testosterone.

80.     Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

81.     Defendants had a duty to exercise reasonable care in the marketing of its Testosterone.  In particular, they had a duty to assure that their products did not pose an unreasonable risk of bodily harm and adverse events.

82.     Defendants failed to exercise reasonable care in marketing its testosterone products in that they knew or should have known that this product could cause significant bodily harm or death and was not safe for use by consumers including Plaintiff.

83.     At all relevant times, it was foreseeable to Defendants that consumers like Plaintiff would suffer injury as a result of Defendants' failure to exercise ordinary care as

described above.

84.     Defendants' negligence was a proximate cause of Plaintiff's injuries, harm and economic loss which Plaintiff suffered, and will continue to suffer, as described and prayed for herein.

## FOURTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY

85.     Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

86.     Prior to the time that the aforementioned products were used by Plaintiff, Defendants impliedly warranted to Plaintiff and Plaintiff's agents and physicians that Testosterone was of merchantable quality and safe and fit for the use for which it was intended.

87.     Plaintiff was and is unskilled in the research, design and manufacture of the products and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using Testosterone.

88.     Testosterone was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that Testosterone has dangerous propensities when used as intended and will cause severe injuries to users.

89.     As a result of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

18

## FIFTH CAUSE OF ACTION

## FOR BREACH OF EXPRESS
## WARRANTY

90.     Plaintiff incorporates by reference here each of the allegations heretoforeset forth in this Complaint as though fully set forth herein.

91.     At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Testosterone is safe, effective, fit and proper for its intended use. Plaintiff purchased Testosterone relying upon these warranties.

92.     Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants when using the Testosterone Replacement Therapy.   These warranties and representations were false in that Testosterone is unsafe and unfit for its intended uses.

93.     As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## SIXTH CAUSE OF ACTION

## FRAUD

94.     Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

19

95.     From the time Defendants first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Testosterone, and up to the present, Defendants willfully deceived Plaintiff by concealing from him, Plaintiff's physicians and the general public the true facts and risks concerning Testosterone Replacement Therapy, which the Defendants had a duty to disclose.

96.     At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Testosterone and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using Testosterone. Defendants knew that Testosterone is not safe, fit and effective for human consumption, that using Testosterone is hazardous to health, and that Testosterone has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff suffered.

97.     Defendants concealed and suppressed the true facts concerning its Testosterone Replacement Therapy with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff's physicians would not prescribe Testosterone, and Plaintiff would not have used Testosterone, if they were aware of the true facts concerning its dangers.

98.     As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

## SEVENTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

99.     Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

100.    From the time Testosterone was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to the misrepresentation that Testosterone was safe, fit and effective for human consumption. At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of Testosterone and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the health risks and consequences of the use of the abovementioned products.

101.    The Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

102.    The representations by the Defendants were in fact false, in that Testosterone is not safe, fit and effective for human consumption, using Testosterone is hazardous to health, and Testosterone has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

103.    The foregoing representations by Defendants, and each of them, were made

21

with the intention of inducing reliance and the prescription, purchase and use of Testosterone.

104. In reliance on the misrepresentations by the Defendants, and each of them, Plaintiff was induced to purchase and use Testosterone. If Plaintiff had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used Testosterone. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

105. As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## EIGHTH CAUSE OF ACTION

## CONSUMER PROTECTION VIOLATIONS

106. Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

107. This Complaint is filed and these proceedings are instituted pursuant to any applicable consumer protection law, including without limitations, the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505 *et seq*.).

108. Defendants' acts and business practices constitute unlawful methods of competition and unfair or deceptive acts within the meaning of applicable law including but not limited to the following.

(a) Representing to Plaintiff, Plaintiff's physicians and the general public that its

22

Testosterone was safe, fit and effective for all patients, knowing that said representations were false;

(b) Concealing from Plaintiff, Plaintiff's physicians and the general public that its Testosterone had a serious propensity to cause injuries to users;

(c) Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that the use of its Testosterone was safe, and had fewer side effects and adverse reactions than other options for treating symptoms of low testosterone, even though the Defendants knew these to be false, and/or had no reasonable grounds to believe them to be true;

(d) Purposely downplaying and understating the health hazards and risks associated with its Testosterone.

109. Defendants' acts and business practices constitute unlawful methods of competition and unfair or deceptive acts within the meaning of applicable law. Plaintiff demands that Defendants immediately cease the illegal conduct alleged herein.

110. The illegal conduct alleged herein is continuing and there is no indication that Defendants will refrain from such activity in the future.

111. Pursuant to the applicable law, Plaintiff is entitled to injunctive relief, attorneys' fees and any other relief this Court deems proper.

## **PUNITIVE DAMAGES ALLEGATIONS**

112. Plaintiff incorporates by reference here each of the allegations heretofore

23

set forth in this Complaint as though fully set forth herein.

113.    The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights of Plaintiff and other Testosterone users and for the primary purpose of increasing Defendants' profits from the sale and distribution of Testosterone. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

114.    Prior to the manufacturing, sale, and distribution of Testosterone, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff. Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using Testosterone.

115.    Despite this knowledge, Defendants, acting through their officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Testosterone and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in Testosterone. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and

24

marketing of Testosterone knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

116. Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

(a) For general damages in a sum in excess of $75,000 or the jurisdictional minimum of this Court;

(b) For medical, incidental and hospital expenses according to proof;

(c) For pre-judgment and post-judgment interest as provided by law;

(d) For full refund of all purchase costs Plaintiff paid for Testosterone;

(e) For compensatory damages in excess of the jurisdictional minimum of this Court;

(f) For consequential damages in excess of the jurisdictional minimum of this Court;

(g) For punitive damages in an amount in excess of any jurisdictional minimum of this Court in an amount sufficient to deter similar conduct in the future;

(h) For attorneys' fees, expenses and costs of this action; and

(i) For such further relief as this Court deems necessary, just and proper.

Dated: <u>January 22, 2015</u>                    RESPECTFULLY SUBMITTED,

                                                  BARON & BUDD, P.C.

                                                  By:  <u>/s/ Stephen Blackburn</u>
                                                  Thomas Sims (TX Bar # 24013518)
                                                  Stephen Blackburn (TX Bar: 24043555)
                                                  3102 Oak Lawn Avenue, Suite 1100
                                                  Dallas, TX 75219
                                                  (214) 521-3605 telephone
                                                  (214) 520-1181 facsimile
                                                  <u>tsims@baronbudd.com</u>
                                                  <u>sblackburn@baronbudd.com</u>